David M. Lisi (SBN 154926)
lisid@howrey.com
HOWREY LLP
1950 University Avenue, 4th Floor
East Palo Alto, California 94303
Telephone: (650) 798-3500
Facsimile: (650) 798-3600

Isabelle M. Carrillo (SBN 199867)
carrilloi@howrey.com
HOWREY LLP
4 Park Plaza, Suite 1700
Irvine, California 92614
Telephone: (949) 721-6900
Facsimile: (949) 721-6910

Attorneys for Defendant Ultimate Ears, LLC

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

| | |
|---|---|
| JERRY HARVEY, JR., an individual,<br><br>Plaintiff,<br><br>vs.<br><br>ULTIMATE EARS, LLC, a California limited-liability company; UE INVESTMENT, LLC, a California limited-liability company; INNOVATE PARTNERS, INC., a California corporation; UE TWO, LLC, a California limited-liability company; ROBERT G. ALLISON, an individual,<br><br>Defendants.<br><br>────────────────────<br><br>ULTIMATE EARS, LLC, a California limited-liability company,<br><br>Counter-Claimant,<br><br>vs.<br><br>JERRY HARVEY, JR., an individual,<br><br>Counter-Defendant. | Case No. 8:09-cv-00668-DOC (MLG)<br>(Related Case No. SACV09-668 DOC (MLGx))<br><br>**ULTIMATE EARS, LLC'S COUNTER-COMPLAINT FOR**<br><br>**1.) BREACH OF CONTRACT**<br>**2.) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING;**<br>**3.) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**4.) FALSE ADVERTISING (LANHAM ACT);**<br>**5.) FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500); AND**<br>**6.) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)**<br><br>**JURY TRIAL DEMANDED**<br><br>Judge: Hon. David O. Carter<br>Courtroom: 9D.<br><br>Date Action Filed: October 2, 2008 |

Defendant and Counter-Complainant Ultimate Ears, LLC ("UE LLC") seeks injunctive and monetary relief from Plaintiff Jerry Harvey ("Harvey") for breach of contract, breach of the covenant of good faith and fair dealing, intentional interference with prospective economic advantage, false advertising in violation of 15 United States Code sections 1125 *et seq.* (the "Lanham Act"), false advertising in violation of California Business and Professions Code sections 17500 *et seq.*, and unfair competition in violation of California Business and Professions Code sections 17200 *et seq.* for his activities related to the sale of in-ear listening devices.

As alleged more fully below, Harvey has violated, and continues to violate an express written agreement not to compete with UE LLC's business and not to solicit UE LLC's customers, which he negotiated and entered into when he sold his shares in the business. Further, he is intentionally interfering with UE LLC's business relationships and is making false statements in connection with the sale of what he advertises to be Jerry Harvey Audio, LLC's ("JH Audio") products, causing confusion in the marketplace.

## **PARTIES**

1.      Defendant and Counter-Complainant UE LLC is a limited liability company organized under the laws of California having its principal place of business at 5 Jenner Street, Suite 100, Irvine, CA, 92618. UE LLC manufactures and distributes in-ear monitors ("IEMs") to professional musicians and their sound engineers and to audio enthusiasts around the world, including in California.

2.      Plaintiff and Counter-Defendant Harvey is an individual who co-founded and worked at Ultimate Ears Inc. ("UE Inc."), a company incorporated under the laws of Nevada, until he sold his entire interest in the company in 2007. On information and belief, he now resides in Florida.

3.      Upon information and belief, Jerry Harvey now is the owner and co-manager of JH Audio. Upon information and belief, JH Audio is a domestic limited liability company organized and existing under the laws and the State of Nevada as of

September 6, 2007, with its principal place of business at 119 Buttercup Road, Lake Ozark, MO, 65049.  Jerry Harvey manages JH Audio together with his wife Brittany Harvey.  Upon information and belief, JH Audio is licensed to do business and was, and is, doing and transacting business in the State of California.  Upon information and belief, JH Audio is in the business of designing, manufacturing and distributing custom IEMs.

## JURISDICTION AND VENUE

4.    UE LLC files this Counter-Complaint in the case entitled *Harvey v. Ultimate Ears LLC et al.*, which originally was filed in the District of Nevada, where it was numbered 2:08-CV-1330 PMP-LRL.  The District of Nevada denied Harvey's request to preliminarily rescind or modify the Restrictive Covenant that is the subject of this Counter-Complaint and transferred the case to this Court "for the convenience of the parties and in the interest of justice."  *See* Docket No. 61 in the District Court of Nevada's Civil Docket for Case # 2:08-cv-01330-PMP-LRL (May 29, 2009 Order granting Motion to Transfer and Denying Plaintiff's Motion for Preliminary Injunction) ("Order") at 3:10-11; 4:25-5:4; Docket No. 62 (Transmittal of Order, Docket Sheet & CD containing PDF document images forwarded to USDC-Central California re Order Granting Motion to Transfer Case).  The causes of action pleaded herein arise out of the same subject matter as *Harvey v. Ultimate Ears LLC et al.*

5.    Jurisdiction and venue are proper here pursuant to the District of Nevada's Order in *Harvey v. Ultimate Ears LLC et al.*, which held that "[t]ransfer to the United States District Court for the Central District of California (Southern Division) is appropriate" (Order at 2:7-8), on the grounds that:

> the Central District of California would have jurisdiction in this matter because it…may exercise diversity and federal question jurisdiction; venue would be proper as all Defendants reside in California and several have their principal place of business in Orange County; and personal jurisdiction is proper as all Defendants would be subject to personal jurisdiction in California.

1  Order at 3:5-9.

2      6.    This Court also has jurisdiction over this entire action pursuant to 28

3  U.S.C. § 1332(a)(1) (diversity of citizenship), because Defendant/Counter-Complainant

4  UE LLC is a citizen of a different state than is Plaintiff/Counter-Defendant Harvey, and

5  the amount in controversy exceeds $75,000.

6      7.    Because UE LLC's claims are based, in part, on violations of the Lanham

7  Act (15 U.S.C. § 1125(a)), this Court also has jurisdiction over the subject matter of this

8  action under 28 U.S.C. § 1331 (federal question) and has supplemental jurisdiction

9  under 28 U.S.C. § 1367(a) over UE LLC's claims under California law.

10     8.    This Court also has personal jurisdiction over Plaintiff/Counter-Defendant

11 Harvey because Harvey, through his company JH Audio, has been licensed to do

12 business, and has been doing business, or both, in the State of California at all times

13 relevant hereto.

14     9.    Venue also is proper in this District under 28 U.S.C. §1391(b) because,

15 upon information and belief, a substantial part of the events or omissions giving rise to

16 these counter-claims occurred and are occurring in this District.

17                          **FACTUAL BACKGROUND**

18 **A.    Harvey's Founding of Ultimate Ears**

19     10.   Harvey has been involved in the music entertainment industry since at least

20 1986, when he worked as sound engineer for the music group Van Halen.  In the course

21 of that and subsequent employment Harvey developed numerous industry contacts and

22 designed audio devices for musicians that would allow them individual feedback during

23 performances.  Harvey sold numerous devices through his industry connections, and

24 eventually set up an S-corporation through which to market them.  He named the

25 company Ultimate Ears, Inc. ("UE Inc.").  UE Inc. was a Nevada corporation through

26 which Harvey intended to market and distribute his IEMs.

27     11.   Harvey owned 50% of UE Inc., while the other 50% was owned by

28 Harvey's then-wife and co-founder, Melinda (Mindy) Harvey.  Harvey ran the company

1  together with Mindy Harvey.  After they divorced, Harvey and Mindy Harvey ran UE

2  Inc. out of Mindy Harvey's home in Las Vegas.

3      12.    Upon information and belief, in approximately 2001-2002, after litigation

4  with UE Inc.'s manufacturer over ownership of IEM designs, UE Inc. began

5  manufacturing its own IEMs.  By 2003, UE Inc. had approximately one million dollars

6  in revenue and serviced 75-80% of the professional market.

7      13.    In the Spring of 2004, Harvey and Mindy Harvey approached Robert

8  Allison to discuss the development of mobile headsets for the consumer market.

9      14.    Since Harvey and UE Inc. lacked working capital and knowledge of how to

10  develop consumer products and manage retail sales channels, Harvey was interested in

11  working with Mr. Allison to build a consumer products business based on headset

12  technology.  Between May and December 2004, Mr. Allison's company, Innovate

13  Partners, Inc. ("Innovate"), researched the viability of the consumer products UE Inc.

14  wanted to build.

15      15.    Harvey and Mindy Harvey sought to partner with Innovate to move UE

16  Inc. into the market for lower-priced, universal-fit IEMs, expand manufacturing

17  overseas and bring in a new CEO.

18      16.    On January 10, 2005, UE Inc. and Innovate, through UE Investment,

19  entered into an Operating Agreement and formed Ultimate Ears LLC, a California

20  limited liability corporation located in Orange County, California.   That same day, UE

21  Investment (also a California limited liability corporation located in Orange County,

22  California), UE LLC, and UE Inc. entered into a Membership Interest Purchase

23  Agreement ("MIPA").

24      17.    In exchange for $500,000 cash and a $250,000 credit line, UE Investment

25  received a 33.33% interest in UE LLC.  In exchange for the remaining 66.66% of UE

26  LLC, Harvey's entity, UE Inc., contributed intellectual property rights to UE LLC.

27      18.    Mindy Harvey and Harvey each owned 50% of UE, Inc., and thus each

28  owned 33.33% interest in UE LLC.

**B.    Harvey's Sale of His Interest in Ultimate Ears**

19.    By April 2007, approximately 8,500 artists in the music industry and another 3,000 audiophiles were using UE LLC's top-of-the-line custom IEMs.

20.    On April 11, 2007, Harvey began a campaign to sever his ties with UE Inc. Shortly thereafter, Harvey announced that he was exploring the possibility of selling his interest in UE Inc. to third parties.

21.    In order to avoid the complexities of dealing with a third party, Mindy Harvey and Mr. Allison decided to make an offer to Harvey for his interest in UE Inc. Harvey agreed that he would sell his entire interest in UE Inc. for $2.4 million in cash.

22.    On September 11, 2007, Harvey, UE Inc. and UE LLC executed the Stock Purchase Agreement, which was a written agreement to repurchase Harvey's shares in UE Inc. for $2.4 million in cash (the "SPA"), a true and correct copy of which is attached to this Complaint as Exhibit A.  Pursuant to the terms of the SPA, UE LLC assigned all of its rights as "Purchaser" under that Agreement to UE Two, LLC ("UE Two") on October 11, 2007 and Harvey transferred his shares to UE Two that same day. Harvey was represented by his attorney, Jim Scheinkman of Snell & Wilmer, in connection with the sale.

**C.    Harvey Agreed to the Restrictive Covenant in the Stock Purchase Agreement**

23.    In order to protect the value of the business Harvey sold when he sold his entire ownership interest in UE Inc., including its goodwill, customer relationships and other know-how, the SPA placed restrictions on Harvey, *inter alia* limiting his ability to compete against UE LLC in the business in which UE Inc., UE LLC or any of its subsidiaries engaged as of the date of the closing of Harvey's stock sale.  SPA, at § 7.03(a).

24.    Specifically, Section 7.03 of the SPA contains the following restrictive covenant:

> (a)    [I]n the event the Closing occurs, for a period of five (5) years
> from the Closing and after the Closing Date, [Harvey] shall not

(i)     Enter, directly or indirectly, into the employment of, or render, directly or indirectly, any services (whether as a director, officer, employee, agent, Representative, independent contractor, consultant or advisor or any other similar relationship or capacity) to, any Person (such Person is referred to as a "Competitor") which competes with, or carries on the Business or a similar business to any business carried on by … UELLC …as of the Closing (collectively, "Restricted Business") in the counties and countries (and all cities located therein) where …UELLC…conducts the Restricted Business or is contemplating conducting the Restricted Business as of the Closing Date (collectively, "Territories");

(ii)    Engage, directly or indirectly, in any such Restricted Business in any of the Territories;

(iii)   Become interested, directly or indirectly, in any such Competitor or Restricted Business as an individual, proprietor, franchisee, partner, joint venturer, owner, stockholder, principal, member, investor, trustee or any other similar other relationship or capacity (other than passive direct or indirect ownership of less than 5% in the aggregate in any Competitor whose stock is publicly traded);

(iv)    Directly or indirectly, by sole action or in concert with others, solicit, induce or influence, or seek to solicit, induce or influence, any Person who is engaged by …UELLC…as an employee, agent, independent contractor or otherwise, to leave the employ of or engagement by …UELLC…; and

(v)     Directly or indirectly, by sole action or in concert with others, solicit, induce or influence, or seek to solicit, induce or influence, any customer or client of …UELLC…, or any potential customer or client of UELLC…, during the three (3) year period immediately preceding [sic] the Closing Date for purposes of facilitating the conduct by [Harvey] of a Restricted Business (for the avoidance of doubt, Seller shall not be prohibited from soliciting customers or clients of UELLC…solely with respect to activities that do not amount to a Restricted Business….

1 | SPA, § 7.03(a).

2 |     25.    Harvey and his attorney negotiated the terms of the SPA, including the

3 | Restrictive Covenant.

4 |     26.    Because Harvey had expressed an intention to develop aviation headsets

5 | after his sale of the IEM business, Harvey and his attorney expressly protected Harvey's

6 | new line of business with the inclusion in the Restrictive Covenant of an express carve-

7 | out.  Section 7.03 provided a specific carve-out from the Restrictive Covenant,

8 | permitting the:

> design, manufacture, distribution, licensing or selling of
> headsets, ear pieces or other hearing equipment, solely for use
> in aircraft and spacecraft, or providing services solely in
> connection with the foregoing ('Allowed Activity') but only to
> the extent that the Allowed Activities will not cause Seller, or
> his Representatives or Affiliates, to become directly or
> indirectly involved in any aspect of the Restricted Business
> that is not an Allowed Activity….

15 | SPA, § 7.03(c).

16 |     27.    This carve-out was negotiated and agreed to in writing by Harvey, through

17 | his counsel, as distinct consideration for the five-year term of the Restrictive Covenant.

18 | The initial proposal for the Restrictive Covenant was for a two-year term.  Then Harvey

19 | requested the carve-out for aviation headsets.  In exchange, UE Inc. proposed the longer

20 | term for the Restrictive Covenant.  Harvey, through his counsel, agreed, responding in

21 | writing that "as the quid pro quo for granting a five year noncompete, we expect a full

22 | carveout for the aviation headset business."

23 |     28.    Given the significant value to UE LLC of UE Inc.'s intellectual property

24 | rights, the parties also negotiated and agreed to a provision in the SPA protecting those

25 | rights.  Section 7.03(b) restricts Harvey's ability to disclose to any persons any of the

26 | trade secrets or confidential information UE LLC used in its business as follows:

> (b) [Harvey] shall not at any time divulge, furnish or make accessible
> to any Person … Confidential Information or Trade Secrets or any

trade secret or confidential information of third parties used in the Business.

SPA, § 7.03(b)

29. The SPA also expressly states that:

(i) the covenants and the restrictions contained in Section 7.03(a) are a material factor to the execution of this Agreement by Purchaser…and are necessary and required for the protection of the Restrictive Covenant Beneficiaries and their respective members and shareholders; (ii) such covenants relate to matters that are of extraordinary value; and (iii) a breach of any such covenants will result in irreparable harm and damages to the Restrictive Covenant Beneficiaries and their respective members and shareholders in an amount difficult to ascertain and which cannot be adequately compensated by a monetary award. Accordingly, in addition to any of the relief to which the Restrictive Covenant Beneficiaries and their respective members and shareholders may be entitled at law or in equity, such Persons shall be entitled to temporary and/or permanent injunctive relief from any breach or threatened breach by [Harvey] of Section 7.03(a) without proof of actual damages that have been or may be caused to the Restrictive Covenant Beneficiaries and their respective members and shareholders by such breach or threatened breach.

SPA, § 7.03(f).

30. Harvey also agreed to include a provision permitting UE LLC's assignment of its rights, interests and obligations as purchaser to an affiliate or an acquirer, and also permitted assignments and transfers by operation of law. SPA, § 10.07.

31. The purchasers of Harvey's entire interest in UE Inc. in September-October, 2007, paid all money due and owing in connection with the SPA. The purchasers of Harvey's entire interest in UE Inc. complied with all applicable conditions of the September 11, 2007, SPA.

**D.     The Sale of UE LLC to Logitech**

32.     In 2007, UE LLC introduced fourteen new products.  Most of those products were introduced in the April through September 2007 time frame for sampling in anticipation of the holiday season.  Sales of new products during the subsequent 2007-2008 holiday season substantially improved revenue.

33.     In January 2008, Mindy Harvey and Mr. Allison hired Barrington Investment Bankers to explore the possibility of selling UE LLC.  In approximately May 2008, Barrington introduced Mr. Allison to Logitech, Inc. ("Logitech").

34.     On August 14, 2008, UE Acquisition, Inc. ("UE Acquisition"), a wholly-owned subsidiary of Logitech, and UE Two, Melinda Harvey, and the M. Harvey 2008-1 Charitable Remainder Trust  – a trust established by Melinda Harvey which at that time held approximately 7.5% of the stock of UE, Inc. – entered into the Equity Interest Purchase Agreement ("EIPA"), pursuant to which UE Acquisition acquired all of the outstanding shares of UE, Inc., including all of the shares Harvey transferred to UE Two.

35.     UE Acquisition purchased UE Investment's 40% interest in UE LLC.  By acquiring all of the outstanding shares of UE, Inc. – which held 60% of UE LLC – and UE Investment's 40% interest in UE LLC, upon execution of the EIPA, UE Acquisition effectively became the sole owner of UE LLC.  In total, Logitech paid $34 million to acquire UE, Inc. and UE LLC.

**E.     UE LLC's Custom IEM Products and Market**

36.     Since Harvey's sale of his entire interest in UE Inc. in 2007 and UE LLC's acquisition by Logitech in 2008, UE LLC has maintained the Ultimate Ears brand in the custom IEM market with its UE Custom Series, custom-molded IEMs targeted mainly at entertainment industry professionals and serious IEM consumers, known as "audiophiles," with price points ranging from $400 to $1150.

37.     UE LLC sells its custom IEMs through multiple channels, including directly through its Web site, www.ultimateears.com, through dealers worldwide, and

1  through a global network of retail partners such as Guitar Center.  For its custom

2  products, UE LLC also has direct relationships with sound engineers and managers

3  within the professional music industry.  UE LLC's custom earphones are used by the

4  "Rock Royalty" of touring professional artists for live performances.  In order to create

5  a custom IEM, a manufacturer must commission or otherwise obtain a custom ear mold

6  fashioned for a particular individual by an audiologist.

7       38.    Because the professional music industry and audiophile communities are

8  very tightly-knit, UE LLC relies heavily on word-of-mouth and personal references to

9  market and sell its custom products.  UE LLC's prospective customer base for its

10  custom IEMs demonstrates strong loyalties to favored brands and personalities.

11  Approximately 80-90 percent of UE LLC's custom IEM customers are repeat

12  purchasers, and almost all sales of custom earphones are on the basis of a

13  recommendation or through ongoing relationships with industry sound managers and

14  engineers.

15  **E.    Harvey's Action and Motion for Preliminary Injunction**

16       39.    On October 2, 2008, Harvey filed an action in the District of Nevada

17  ("Nevada Court") against UE LLC, UE Investment, LLC, Innovate Partners, Inc., UE

18  Two, LLC, and Robert G. Allison ("Defendants") for Breach of Fiduciary Duty,

19  Fraudulent Inducement, Breach of Operating Agreement, Federal Securities Violations,

20  Violation of California Corporate Securities Act, Breach of the Covenant of Good Faith

21  and Fair Dealing, and Violation of the Racketeering Influenced and Corrupt

22  Organizations Act.  *See* Docket No. 1 in the District Court of Nevada's Civil Docket for

23  Case # 2:08-cv-01330-PMP-LRL; Docket No. 62 (transmittal of Nevada case file).

24       40.    On November 14, 2008, Defendants filed a Motion To Dismiss for

25  Improper Venue or in the Alternative To Transfer for Convenience or in the Alternative

26  To Dismiss for Failure To State a Claim or in the Alternative To Stay the Action

27  Pending Arbitration and a Motion To Dismiss Pursuant to Fed. R Civ .P. 12(b)(6) and

28  Memorandum of Points and Authorities in Support Thereof ("Motions").  *See* Docket

1  Nos. 9 and 12 in the District Court of Nevada's Civil Docket for Case # 2:08-

2  PMP-LRL; Docket No. 62 (transmittal).

3      41.    On April 6, 2009, while Defendants' Motions were pending, Harvey filed a

4  Motion for Preliminary Injunction seeking to rescind the Restrictive Covenant in the

5  SPA. *See* Docket No. 30 in the District Court of Nevada's Civil Docket for Case # 2:08-

6  cv-01330-PMP-LRL; Docket No. 62 (transmittal).

7      42.    On May 29, 2009, the Nevada Court issued an order denying Harvey's

8  Motion for Preliminary Injunction and transferred the action to this Court. *See* Docket

9  No. 61 in the District Court of Nevada's Civil Docket for Case # 2:08-cv-01330-PMP-

10 LRL (May 29, 2009 Order) at 1:23-24; Docket No. 62 (transmittal).

11 **F.    Harvey's Competition with UE LLC and Solicitation of UE LLC Customers**

12      **in Violation of the Restrictive Covenant**

13     43.    Upon information and belief, in 2007, after negotiating for the SPA and

14 days before selling his entire interest in UE Inc. under the SPA, Harvey founded JH

15 Audio.  Upon information and belief, JH Audio originally designed, manufactured, and

16 sold sophisticated IEMs for the aviation industry.  Screenshots of the JHA Pro Music

17 section of JH Audio's Web site are attached hereto as Exhibit B.[1]

18     44.    According to the JH Audio Web site, following "years of satisfying

19 customers in the music industry," Harvey "began to look for his next challenge," and "it

20 didn't take Jerry Harvey long to realize that the technology he'd created for rock stars,

21 with a few tweaks, was right at home in the [aviation] cockpit."

22

23

24

25 [1] The Web domain name for Harvey's company, JH Audio, is jhaudio.com, and the
company's Web site can be found at http://www.jhaudio.com.  Records of the Web
26 hosting company GoDaddy.com, Inc. indicate that the domain name, jhaudio.com, is
held by Jerry Harvey Audio, 2 Old Westbury Ln, Webster Groves, Missouri, and was
27 first registered on February 21, 2005.

28

45.     Since at least April 2009, however, Harvey has been competing directly with UE LLC in the field of IEMs for the music industry through his company JH Audio.

46.     Harvey began violating the Restrictive Covenant prior to seeking and being denied an Order rescinding the Restrictive Covenant and he continues to violate the Restrictive Covenant despite being denied his request for a mandatory preliminary injunction from the Nevada Court.

47.     Harvey has been directly competing with UE LLC, soliciting UE LLC's customers, and interfering with UE LLC's relationships by marketing and selling nearly identical products through the same marketing channels.

48.     Harvey's custom IEM product line, the JH Pro Series, consisted of five IEMs as of April 2009: the JH 5 Pro, JH 7 Pro, JH 10 Pro, JH 10x3 Pro, and the JH 11 Pro.  Prices for the IEMs ranged from $599 for the JH 5 Pro to $999 for the JH 11 Pro. Harvey later added a sixth IEM to the line, the JH 13 Pro, which currently sells for $1099.

49.     As the following table shows, a number of Harvey's custom IEMs are nearly identical in name and configuration to UE LLC's custom IEMs.

//
//
//
//
//
//
//
//
//
//
//

| Product Name | Input Sensitivity | Frequency Response | Impedance | Internal Speaker Configuration | Noise Isolation | Input Connector |
|---|---|---|---|---|---|---|
| JH 11 PRO | 119dB @ 1mW | 10Hz to 17kHz | 18 Ohms | Proprietary precision-balanced armatures | -26dB | 1/8" (3.5mm), gold-plated |
| UE 11 PRO | 199db at 1mw | 10Hz to 16,500Hz | 18 Ohms at 1kHz | 4 proprietary balanced armatures with integrated three-way Counterover | -26dB | 1/8" (3.5mm) gold plated |
| JH 10 PRO | 119dB @ 1mW | 20Hz to 17kHz | 13.3 Ohms | Proprietary precision-balanced armatures | -26dB | 1/8" (3.5mm) gold plated |
| UE 10 PRO | 119db @ 1mw | 20 to 16,000Hz | 13.3 ohms | 3 proprietary precision-balanced armatures with an integrated passive crossover circuit board | -26dB | 1/8" (3.5mm) gold plated |
| JH7 PRO | 124dB @ 1mW | 20Hz to 17kHz | 17.5 Ohms | Proprietary precision-balanced armatures | -26dB | 1/8" (3.5mm) gold plated |
| UE 7 PRO | 124db @ 1mw | 20 to 16,000 Hz | 17.5 ohms | 3 proprietary precision balanced armatures | -26dB | 1/8" (3.5mm) gold plated |
| JH 5 PRO | 119dB @ 1mW | 20Hz to 17kHz | 21 Ohms | Proprietary precision-balanced armatures | -26dB | 1/8" (3.5mm) gold plated |
| UE 5 PRO | 119db @ 1mw | 20 to 16,000 Hz | 21 ohms | 2 proprietary precision balanced armatures | -26dB | 1/8" (3.5mm) gold plated |

50.    By April 15, 2009, Harvey already was shopping his services and products to his professional music industry contacts through a blast e-mail message he sent on that date to customers and potential customers of UE LLC and to people who make

decisions (e.g. sound engineers) for customers of UE LLC, including at least one

professional "Front of House" sound engineer.  The e-mail, which bore the subject line,

"My new IEM company JH Audio," announced:

> I just would like to let everyone know that I am officially back in the Professional IEM market again. I can't tell you how much I appreciate the support in the past and I hope to have your support in the future. The pricing will be less than the other company and my Engineer endorsement policy will be geared to help the working engineer. We will make the same high quality products that you have come to expect from me in the past and there will actually be someone who has been on tour dealing with you, Me.

In the e-mail, Harvey provided an e-mail contact address at "Crewspace," which is a

"private social network for professional road crew (roadies) in the music industry

worldwide."

51.     Despite having sold his entire ownership interest in UE LLC in 2007,

Harvey went on to promise in his April 15, 2009 e-mail that "I will be making all of my

old designs."

52.     Harvey also pursued the audiophile market by persuading influential

members of online communities to spread the word of his return.  On April 19, 2009,

Harvey contacted "jude," an administrator of the members' forums for

http://www.head-fi.org, a Web site that hosts online discussions of high-end audio gear

and music.  On April 24, 2009, jude posted an enthusiastic announcement regarding his

conversation with Harvey, declaring that "What [Harvey is] *going* to be up to now is a

full-on reentry into the custom in-ear monitor (IEM) business again – as in IEMs for

stage performers, and, most importantly for me, also *for audiophiles*.  He has already

been shipping products to touring artists, and has some products already available for

general purchase."

53.   In April 2009, Harvey expressed to jude his confidence that his products would be priced competitively based on his "lower overhead." As noted *supra,* Harvey stated that he was already making and shipping custom products as early as April 2009.

54.   UE LLC has had longstanding relationships with numerous popular musicians and performers, including the bands Aerosmith, The Cult, Counting Crows, and Guns N' Roses since before, and continuing after, Harvey's sale of his interest in the company.  Harvey was, and is, aware of these relationships.  These relationships involved UE LLC supplying ongoing support to such performers in the form of engineers to determine their custom IEM requirements, assisting them in preparing custom ear molds to meet device specifications, providing ongoing customer service and handling any re-orders or upgrades.  UE LLC's ongoing customer relationships and goodwill contribute substantially to UE LLC's value as a company, as does the expectation that Harvey could not, and may not, solicit UE LLC's customers for custom IEMs nor interfere with UE LLC's relationships for five years after Harvey's sale of the business.

55.   UE LLC has had a relationship with the band Aerosmith since before Harvey sold his interest in UE LLC on September 11, 2007.  Harvey was aware of this relationship.  Since Harvey's sale of his entire interest in UE Inc. on September 11, 2007, Aerosmith continued to be a UE LLC customer providing UE LLC with revenue.

56.   According to an e-mail sent to UE LLC by a monitor engineer for Aerosmith, sometime before May 19, 2009, while Aerosmith was a customer of UE LLC, Harvey contacted the members of the band Aerosmith directly and secured an agreement with them to sell them custom IEMs manufactured by his new company. The monitor engineer for Aerosmith notified UE LLC that the band was terminating its relationship with UE LLC in favor of Harvey and JH Audio and requested that UE LLC provide Harvey's company the custom ear impressions made for his UE LLC devices so that Harvey could use them to create new JH Audio devices.

57.    In or around July 2009, Harvey solicited another UE LLC customer, the band The Cult.  UE LLC has had a relationship with The Cult since before Harvey sold his interest in UE LLC on September 11, 2007.  Harvey was aware of this relationship.

58.    Since Harvey's sale of his entire interest in UE LLC on September 11, 2007, The Cult has continued to be a UE LLC customer providing UE LLC with revenue.  UE LLC recently had made in-ear monitors for the band's drummer, John Tempesta, and Mr. Tempesta had expressed satisfaction with and enthusiasm for UE LLC's product.  Harvey visited the band and promised its members that he could give them a "better deal."  In or around July 2009, the band terminated the sound engineer who had provided the UE LLC product and hired Harvey as its new engineer and Mr. Tempesta asked UE LLC for a partial refund for the UE LLC product he had purchased.

59.    In or before July 2009, Harvey solicited another UE LLC customer, the band Counting Crows.  UE LLC has had a relationship with Counting Crows since before Harvey sold his interest in UE LLC on September 11, 2007.  Harvey was aware of this relationship.  Since Harvey's sale of his entire interest in UE LLC on September 11, 2007, Counting Crows has continued to be a UE LLC customer providing UE LLC with revenue.  In or around July 2009, Counting Crows terminated its relationship with UE LLC and instead agreed to work with JH Audio.

60.    In or before August 2009, Harvey solicited another UE LLC customer, the band Guns N' Roses.  UE LLC has had a relationship with Guns N' Roses since before Harvey sold his interest in UE LLC on September 11, 2007.  Harvey was aware of this relationship.  Since Harvey's sale of his entire interest in UE LLC on September 11, 2007, Guns N' Roses has continued to be a UE LLC customer providing UE LLC with revenue.  In or around August 2009, Guns N' Roses requested that the ear impressions UE LLC had taken in preparation for the band's concert tour be sent to JH Audio.

61.    UE LLC's reputation and goodwill in the consumer market is directly tied to its standing in the custom market and on customers' perception that they are getting

1  technology similar to that used by music professionals.  This similarity is at the core of

2  UE LLC's retail marketing strategy.  As UE LLC's website states to potential retail

3  customers, "You are about to purchase the same technology developed by the music

4  industry's top artists."  Harvey's efforts to interfere with UE LLC's relationships with

5  music professionals also harms its consumer business.  Attached hereto at Exhibit C is a

6  true and correct copy of a page from UE LLC's website marketing commercial retail

7  products.

8      62.    As of at least May 29, 2009, Harvey's Web site www.jhaudio.com, has a

9  section for JHA Pro Music, which bears the subtitle, "Jerry Harvey is back, and he's

10 ready to kick some ass."  The home page for www.jhaudio.com/promusic states, "Jerry

11 Harvey, sound guru to the gods and pioneer of the custom in-ear monitor, is back, and

12 he's ready to bring the audio world to its knees all over again."

13     63.    On May 30-31, 2009, Harvey had a booth for JH Audio at "CanJam," an

14 International Head-Fi Meet and sound manager and audiophile industry trade show held

15 in Los Angeles, California.  Harvey's CanJam booth was displaying several JH Audio

16 products, including prototype samples of custom molded earphones using multiple

17 balanced armature transducers.  His product samples were implemented with various

18 combinations of three-way and two-way topologies using as few as two or as many as

19 six drivers per earpiece.  Characteristics of Harvey's products, including the cables,

20 stiffener wires, and even the font used to initial each earpiece, were very similar, if not

21 identical, to UE LLC products.  Harvey also was passing out promotional materials and

22 providing audio demonstrations of his products.

23     64.    Not only is Harvey selling a line of nearly identical, competing IEMs,

24 Harvey is using UE LLC's name, reputation, and good will to sell his products.  For

25 example, the brochure Harvey distributed at the CanJam trade show in May 2009

26 advertises the JH 13 Pro IEM.  A true and correct copy of the brochure is attached

27 hereto as Exhibit D.  Among other things the brochure states:

28

1         Audio engineer and sound guru to the gods*, Jerry Harvey is the

2         mastermind behind the custom in-ear audio technology that has set the

3         music world on its ear, and rocked the face off audiophiles worldwide.

4  The "gods" listed at the bottom of the brochure included The Rolling Stones,

5  Aerosmith, Guns N' Roses, Metallica, Van Halen, Sheryl Crow, Linkin Park, Gwen

6  Stefani, Incubus, and The Killers.  The "HOME" page of JHA Pro Music section of JH

7  Audio's Web site makes a similar statement about Harvey and lists the same artists.

8  *See* Exhibit B.  The implication is that these artists were or are customers of JH Audio.

9  All listed artists historically have been UE LLC's clients and were clients when Harvey

10  was with UE LLC.

11        65.    Harvey uses similar tactics to promote himself and his products elsewhere

12  on JH Audio's Web site.  On the "PRESS/REVIEWS" page of the JHA Pro Music

13  section of the JH Audio Web site, Harvey provides a quote from and a link to a 2007

14  *Wired* magazine article:

15        In Wired Magazine's "Gadget Review" section, Joe Brown proclaims the

16        wonders of Jerry Harvey's audio technology, highlighting the innovative
      engineering behind his custom in-ear monitors.  He ends with, "How do

17        they sound? Ask Van Halen – the reconstituted band has already ordered
      several pairs."

18

19  But the article was about UE LLC's IEM products, specifically the UE 11 Pro, not JH

20  Audio's.  In fact, the article even contains a picture of the UE-11 Pro.

21        66.    Upon information and belief, since launching the JH Pro Series line,

22  Harvey has taken a sales approach aimed directly at UE LLC's customers.

23        67.    Harvey's new business piggybacks off of UE LLC's success.  Web

24  commentator "jude's" original posts explains who Jerry Harvey is by describing him as:

25        the founder of Ultimate Ears; and though he's no longer with Ultimate Ears,

26        he designed pretty much everything they released from UE's beginning all

27        the way up to Ultimate Ears' UE-11.  That means Jerry Harvey also

28        designed the UE-10 Pro.

1  A commenter named "Nosoupforyou" responded: "The founder of Ultimate Ears!

2  I can't wait to hear IEMs from this guy."

3      68.    Harvey's new business also trades on customers' familiarity with, and

4  goodwill associated with, the names of UE LLC products.  UE LLC's existing lineup

5  includes the product names UE5 PRO, UE7 PRO, UE10 PRO and UE11 PRO.  The

6  April 24, 2009, statement by jude declared that Harvey was "already making and

7  shipping custom products" that include the JH5 PRO, JH7 PRO, JH10 PRO and JH11

8  PRO.

9      69.    Because of the expense of IEMs for individuals, sales by JH Audio can

10  represent direct losses to UE LLC.  One head-fi.org commenter named

11  "HeadphoneAddict" remarked:

12          I did leave a set of impressions with UE at CanJam for either the UE4 or

13          UE11Pro, and I have another spare set of impressions that I could use for JH

14          customs, but I don't have the money to do both….

15      70.    Harvey's signs and brochures at CanJam depicted a musician playing guitar

16  on a stage.  JH Audio donated an IEM to the CanJam raffle, which generated buzz and

17  excitement for the product and put at least one Harvey IEM into the hands of a potential

18  UE LLC customer.

19      71.    Upon information and belief, customers who otherwise would have

20  purchased UE LLC products have purchased, or have considered purchasing, JH Audio

21  products instead.  On June 11, 2009, an individual with the screen name "Matt" posted

22  the following entry on the Web site, "Garden of Thoughts," located at

23  www.mirimu.com/wordpress:

24          For years I'd been interested in Ultimate Ear's UE-10Pro and
            UE-11 Pro but that company's founder, Jerry Harvey (he
25          pretty much created the custom IEM industry), has now
            formed a new company JH Audio, and I'm leaning towards
26          one of their models.

27

28

72.     Upon information and belief, in April 2009, the JH Pro Series IEMs were only available for direct purchase.  Upon information and belief, by at least June 2009, Harvey was selling his custom IEMs via JH Audio's Web site.  Upon information and belief, Harvey currently offers all six IEMs in the JH Pro Series for direct purchase on www.jhaudio.com.

73.     Upon information and belief, at the time of this Counter Complaint, several Head-Fi users (including those using the names "qusp," "Iron Dreamer," "hockeyb213," "jamato8," "Edwood," and "rlanger") already have purchased IEMs from JH Audio. Upon information and belief, several Head-Fi users (including ones named "robm321," "sachu," "Harun," "jordanross," "pfillion," "Bojamijams," "pila405," "boomana," and "jc9394") are interested in purchasing IEMs from JH Audio.

74.     Since Harvey's return to the custom IEM market, his deceptive marketing and sales tactics have caused confusion among customers.  Harvey is purposefully obscuring the fact that his product is separate from UE LLC's product and trafficking on UE LLC's good will.  Harvey's competition in the custom market harms UE LLC in the custom IEM consumer market.

75.     Harvey's activities and continued interference with UE LLC's customers and business relationships has harmed and will continue to harm the value of UE LLC and its assets.

## CLAIMS AGAINST HARVEY

### COUNT I

### Breach of Contract

### (Common Law of California)

76.     UE LLC realleges and incorporates the allegations set forth in paragraphs 1 through 75 herein.

77.     Harvey, with the advice of counsel, entered into the SPA with UE Inc., Mindy Harvey, and Innovate Partners. (Exhibit A (SPA).)

78.    The SPA contains a Restrictive Covenant that prohibits Harvey from competing with, either by rendering services or employment for or obtaining an interest in, any business that competes directly or indirectly with UE Inc. and/or UE LLC.  SPA, § 7.03(a).  The SPA also prohibits Harvey from soliciting UE LLC's customers.

79.    Harvey signed the negotiated Restrictive Covenant as part of his sale of his entire interest in the UE LLC business.  That Restrictive Covenant was an integral part of his sale, as the business's owner, of his entire ownership interest in UE Inc.  Accordingly, the Restrictive Covenant was part of an asset and goodwill sale contract covered by the Cal. Bus. & Prof. Code § 16601 exception to California's prohibition against non-compete agreements.

80.    Harvey received valuable consideration in exchange for the sale of his stock and his agreement to be bound by the Restrictive Covenant.

81.    UE LLC's purchase price included a valuation of goodwill and expected business as well as of tangible assets.

82.    UE Inc., Melinda Harvey, and Innovate Partners fully performed their obligations under the SPA.

83.    UE LLC's value is partly derived from the expectation that Harvey would honor his obligations under the SPA, including the Restrictive Covenant.

84.    The acts of Harvey complained of herein constitute breach of the Restrictive Covenant.  Harvey's active marketing and sale of IEMs, as well as his soliciting of UE LLC customers through his new company JH Audio, less than two years after he signed a negotiated, written agreement not to compete in UE LLC's line of business for five years, is a breach of the SPA.

85.    Harvey has breached the Restrictive Covenant not to compete by founding, operating, and providing services to JH Audio, a company which develops, markets, and sells (on-line and through direct sales) custom IEMs that directly compete with UE LLC's custom IEMs in their primary geographic markets.  Specifically, Harvey is breaching the provisions of Section 7.03(a) of the SPA by, among other things, (1)

1 entering into the employment of and/or rendering services for JH Audio, which

2 competes with, carries on the same or similar business, and does business in the same

3 counties and countries where UE LLC does business; (2) engaging directly in the same

4 business as UE LLC in the counties and countries where it does business; (3) becoming

5 interested in JH Audio as an individual, proprietor, franchisee, partner, joint venturer,

6 owner, stockholder, principal, member, investor, trustee or any other similar relationship

7 or capacity with more than a passive interest; and (4) soliciting, inducing or influencing,

8 or seeking to solicit, induce or influence, customers or clients of UE LLC and/or

9 potential customers or clients of UE LLC.

10    86.    Harvey's acts have been deliberate, willful, intentional, and in bad faith,

11 with full knowledge and in conscious disregard of UE LLC's rights under the SPA, with

12 intent to trade on UE LLC's goodwill in its customer lists, vendor contacts and product

13 names.  Harvey's request to the District of Nevada for Declaratory Relief from the SPA

14 *while he knowingly was breaching* the agreement shows Harvey's acknowledgement

15 that he was bound by the Restrictive Covenant.

16    87.    Because of Harvey's breach of the Restrictive Covenant, which breach is

17 continuing at least to the date of this Complaint, UE LLC has been deprived of the

18 benefits of the contract.  UE LLC's loss of customers represents not only a loss of sales

19 but also a loss of collateral sales, loss of word-of-mouth goodwill, and loss of exposure.

20 UE LLC also has been forced to spend substantial amounts of money to compete with

21 Harvey's marketing, address Harvey's misrepresentations in advertisements and the

22 press, refund money demanded by former customers Harvey solicited, and engage

23 counsel to enforce the Restrictive Covenant.

24    88.    As a result of the foregoing alleged actions of Harvey, Harvey has been

25 unjustly enriched and UE LLC has been injured and damaged.  Unless the foregoing

26 alleged actions of Harvey are enjoined, UE LLC will continue to suffer injury and

27 damage, which includes financial losses as well as intangible losses, such as the loss of

28 goodwill.  Accordingly, and pursuant to the express language of the SPA (SPA, §

7.03(f)), UE LLC is entitled to an injunction to prevent further competition from Harvey until the expiration of the five-year period provided by the Restrictive Covenant, as well as damages incurred by the breach.

**COUNT II**

**Breach of the Covenant of Good Faith and Fair Dealing**

**(California Common Law)**

89.     UE LLC realleges and incorporates the allegations set forth in paragraphs 1 through 88 herein.

90.     Implied in the SPA is a covenant by Harvey that he would act in good faith and deal fairly with UE LLC, that he would do nothing to interfere with the rights of UE LLC to receive the benefits of the SPA – including the rights of subsequent purchasers of UE LLC – and that he would give at least the same level of consideration to UE LLC's interests as it would give to his own interests.  Instead of complying with these duties, Harvey has acted, and is acting, in bad faith with respect to competition in the custom IEM field.  This conduct includes, but is not limited to, the following:

      a.    Marketing custom IEMs against UE LLC explicitly, despite agreeing to limit his activities to aviation-related ear pieces for a duration of five years from his sale of the company.

      b.    Providing at least one free IEM for the CanJam raffle in order to guarantee that his product would get into the hands of an audiophile, expanding his market share and developing word-of-mouth recognition.

91.     Harvey's overt marketing of essentially identical products within the same geographic areas as UE LLC, and indeed, to UE LLC's own customers, represents a conscious, willful, and deliberate attempt by Harvey to improperly deprive UE LLC of benefits to which it is entitled under the SPA as purchaser in good faith of Harvey's interest.

92.    Harvey's request to the District of Nevada for a mandatory injunction to relieve him from his obligations under the Restrictive Covenant *while he was violating the Restrictive Covenant* reflects Harvey's acknowledgement that he was bound by the Restrictive Covenant and demonstrates his willful bad faith in breaching the Covenant.

93.    As a result of Harvey's conscious, willful, and deliberate attempt to improperly compete with UE LLC and steal its customers, Harvey has breached his implied covenant of good faith and fair dealing owed to UE LLC.

94.    As a direct and proximate result of Harvey's breach of his implied covenant of good faith and fair dealing, UE LLC has been forced to seek recovery of the benefits of the SPA through this litigation.

95.    As a result of the foregoing alleged actions of Harvey, Harvey has been unjustly enriched and UE LLC has been injured and damaged.  Unless the foregoing alleged actions of Harvey are enjoined, UE LLC will continue to suffer injury and damage, which includes financial losses as well as loss of goodwill.  Accordingly, UE LLC is entitled to an injunction to prevent further competition from Harvey until the expiration of the five-year period provided by the Restrictive Covenant as well as damages incurred by the breach.

## COUNT III

### Intentional Interference with Prospective Economic Advantage

### (California Common Law)

96.    UE LLC realleges and incorporates the allegations set forth in paragraphs 1 through 95 herein.

97.    UE LLC developed relationships between itself and numerous customers, including Aerosmith, The Cult, Counting Crows, and Guns N' Roses through its provision of IEMs for those bands and their individual members reaching back prior to the time Harvey sold his interest in UE LLC.  Those relationships were part of the assets and goodwill UE LLC purchased.  The relationships UE LLC had developed

1  with IEM users among the general public, carried with them the probability of future

2  economic benefit to UE LLC.

3      98.    Harvey was aware of these relationships through his involvement with UE

4  LLC before he sold the company along with its goodwill in 2007.  On information and

5  belief, Harvey's ability to sell his products to these customers now is based heavily on

6  the customers' familiarity with and confidence in UE LLC's products.

7      99.    Harvey's copying of UE LLC product names, appearance and peripheral

8  characteristics takes advantage of the goodwill developed by UE LLC.  Harvey's

9  ability to undercut UE LLC's prices also is supported by customers' pre-existing

10  goodwill for UE LLC products, for which he need not spend additional marketing or

11  product development funds.

12      100.   Harvey's actions as alleged *supra*, including his development of a Web site

13  for his competing products, his misuse of product recommendations that cite to UE

14  LLC products, his efforts to approach UE LLC customers directly, his references to UE

15  LLC products and pricing in his marketing, his display of competing products at venues

16  where UE LLC itself and UE LLC customers are present, his direct e-mails to UE LLC

17  customers and his communications with influential members of the audiophile

18  community are intentional acts designed to disrupt the relationships between UE LLC

19  and its customers.  More specifically, Harvey contacted members of the band

20  Aerosmith in May 2009.  He also approached the band The Cult in or around July 2009

21  and the bands Counting Crows and Guns N' Roses to solicit their business.  In all four

22  instances, Harvey was able to persuade the bands to terminate their respective

23  relationships with UE LLC in favor of JH Audio.  Members of the audiophile

24  community also represented that they have bought or are likely to buy Harvey's IEMs

25  rather than UE LLC's devices.

26      101.   Harvey's actions, as described *supra*, actually have disrupted relationships

27  between UE LLC and at least four bands (including Aerosmith, The Cult, Counting

28

1  Crows, and Guns N' Roses) and have appropriated sales of general-market consumers

2  that would otherwise have gone to UE LLC.

3     102.   Harvey's actions, as described *supra*, have proximately caused economic

4  harm to UE LLC through not only lost anticipated future revenues from these long-

5  term relationships, but also expenses related to marketing to counter Harvey's

6  representations and misrepresentations, refunds to customers, monitoring of Harvey's

7  competitive activities and investigation and pursuit of UE LLC's legal options.

8     103.   Harvey's actions, as described *supra*, were and are independently

9  wrongful, as activities in violation of his restrictive covenant under the SPA.

10    104.   As a result of the foregoing alleged actions of Harvey, Harvey has been

11  unjustly enriched and UE LLC has been injured and damaged.  Unless the foregoing

12  alleged actions of Harvey are enjoined, UE LLC will continue to suffer injury and

13  damage, which includes financial losses as well as loss of goodwill.  Accordingly, UE

14  LLC is entitled to an injunction to prevent further competition from Harvey until the

15  expiration of the five-year period provided by the Restrictive Covenant as well as

16  damages incurred by the breach.

17                          **COUNT IV**

18                      **False Advertising**

19         **(in Violation of the Lanham Act, 15 U.S.C. § 1125(a))**

20    105.   UE LLC realleges and incorporates the allegations set forth in paragraphs 1

21  through 104 herein.

22    106.   Harvey's misrepresentations about his clientele and products constitute

23  false advertising under 15 U.S.C. § 1125(a).

24    107.   Statements contained in the e-mails Harvey sent to potential customers,

25  brochures Harvey distributed and signage Harvey displayed at CanJam and statements

26  made on the jhaudio.com Web site constitute commercial advertising.

27

28

108.   The information conveyed in the foregoing statements constitute materially false and/or misleading descriptions or representations of fact about his products in violation of 15 U.S.C. § 1125(a).

109.   Harvey's false statements have been made in interstate commerce.  His false attribution of product recommendations and client lists to his own products when they really reference UE LLC's products have been published to the Internet which is available nationally and worldwide, and in brochures that have been distributed at industry conventions with a world-wide audience.  UE LLC has received inquiries from its customers in China regarding the implications of Harvey's activities in the IEM market.

110.   The information conveyed the foregoing statements is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of JH Audio IEMs or as to the origin, sponsorship or approval of Harvey's goods, services or activities, in violation of 15 U.S.C. § 1125(a).

111.   The deception is material in that it influences, or is likely to influence, consumer's purchasing decisions.

112.   By reason of the foregoing, UE LLC has been and will continue to be irreparably harmed and damaged.  UE LLC's remedies at law are inadequate.  Unless the foregoing alleged actions of Harvey are enjoined, UE LLC will continue to suffer injury and damage, which includes financial losses as well as loss of goodwill.  Accordingly, UE LLC is entitled to an injunction to prevent further false advertising from Harvey or his company, JH Audio.

113.   As a result of Harvey's wrongful acts, UE LLC has been damaged in an amount to be determined at trial, plus interest, attorneys' fees and costs.  Harvey's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for UE LLC's rights, and as a direct and proximate result thereof UE LLC suffered damage in a total amount to be proven at trial, therefore UE LLC seeks

1   exemplary damages, punitive damages, and treble damages pursuant to 15 U.S.C.

2   § 1117(b) in an amount sufficient to deter Harvey from similar future wrongful conduct.

3                                    **COUNT V**

4                                **False Advertising**

5   **(in Violation of California Business and Professions Code §§ 17500 *et seq.*)**

6

7       114.   UE LLC realleges and incorporates the allegations set forth in paragraphs 1

8   through 113 herein.

9       115.   Harvey's misrepresentations about his clientele and products constitute

10  false advertising under California law.

11      116.   Harvey has made false statements in commercial publications in

12  connection with the sale of his own products *vis a vis* those of UE LLC.

13      117.   Harvey's citation to a 2007 *Wired* Magazine article on jhaudio.com is

14  misleading.  On information and belief, the article was written in September 2007

15  about the products Harvey made for UE LLC (specifically, the UE 11 Pro).  But the

16  quote excerpted on the "PRESS/REVIEWS" pages of the JHA Pro Music section of the

17  JH Audio Web site only states that Joe Brown of Wired Magazine "proclaims the

18  wonders of Jerry Harvey's audio technology" without any reference to the true nature

19  of the article.  Similarly misleading is Harvey's representation, on the "Home" page of

20  the JHA Pro Music section of JH Audio's Web site and in a promotional pamphlet

21  Harvey distributed at CanJam, that he is the "music guru" to various professional music

22  artists, for example, the Killers, a number of which artists are actually UE LLC's

23  clients.

24      118.   Statements contained in the e-mails Harvey sent to potential customers,

25  brochures Harvey distributed, signage Harvey displayed at CanJam, and statements

26  made on the jhaudio.com Web site constitute commercial advertising.

27      119.   On information and belief, Harvey's statements were disseminated to

28  persons in the State of California

120.   Harvey's false statements are material and substantially influence, or are likely to influence, buying decisions by UE LLC's target markets.

121.   Harvey's misrepresentations have actually deceived or have the tendency to deceive, and certainly have the potential to influence, potential buyers to buy JH Audio products, thereby causing damage to UE LLC.

122.   Harvey knew or should have known that the information conveyed in the foregoing statements constitute materially false and/or misleading descriptions or representations of fact about his products in violation of California Business & Professions Code § 17500.

123.   Harvey knew or should have known that the information conveyed in the foregoing statements is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of JH Audio IEMs or as to the origin, sponsorship or approval of Harvey's goods, services or activities, in violation of California Business & Professions Code § 17500.

124.   UE LLC has been and continues to be injured by direct diversion of sales from itself to Harvey or by a lessening of the goodwill associated with UE LLC's products.

125.   By reason of the foregoing, UE LLC has been and will continue to be irreparably harmed and damaged.  UE LLC's remedies at law are inadequate.  Unless the foregoing alleged actions of Harvey are enjoined, UE LLC will continue to suffer injury and damage, which includes financial losses as well as loss of goodwill.  Accordingly, UE LLC is entitled to an injunction to prevent further false advertising from Harvey or his company, JH Audio.

126.   As a result of Harvey's wrongful acts, UE LLC has been damaged in an amount to be determined at trial, plus interest, attorneys' fees and costs.  Therefore UE LLC also seeks damages in an amount to compensate UE LLC for those costs.

127.   Harvey's actions were undertaken willfully, wantonly, maliciously and in reckless disregard for UE LLC's rights, and as a direct and proximate result thereof UE

LLC suffered damage in a total amount to be proven at trial, therefore UE LLC also seeks exemplary and punitive damages in an amount sufficient to deter Harvey from similar future wrongful conduct.

## COUNT VI

### Unfair, Unlawful, and Deceptive Trade Practices

### (in Violation of California Business & Professions Code §§ 17000 *et seq.*)

128.    UE LLC realleges and incorporates the allegations set forth in paragraphs 1 through 127 herein.

129.    Harvey's actions discussed herein constitute unfair competition within the meaning of California Business & Professions Code § 17200.

130.    Harvey's competition with UE LLC through his company JH Audio that takes advantage of industry contacts, customer lists, relationships with suppliers as well as customers, product designs, product names, trade dress characteristic of UE LLC products and other knowledge he developed and acquired through his work at UE Inc. is outside the boundaries of fair competition especially in light of the Restrictive Covenant.

131.    On information and belief, Harvey intended for his activities, as alleged *supra,* to result in the sale or lease of goods or services to consumers.

132.    Harvey's unlawful and deceptive activities, as alleged *supra,* constitute unfair competition in violation of California's Unfair Trade Practices Act, Business & Professions Code §§ 17200 *et seq.*, as they are likely to deceive and mislead the public.

133.    Harvey's solicitations of UE LLC's clients violate California laws against intentional interference with economic relations.

134.    Various of Harvey's promotional materials and portions of his Web site violate California and federal false advertising laws.

135.    As a result of the foregoing alleged actions of Harvey, Harvey has been unjustly enriched and UE LLC has been injured and damaged.  Unless the foregoing

1  alleged actions of Harvey are enjoined, Harvey will continue to suffer injury and

2  damage, which includes financial losses as well as loss of goodwill.

3       136.   Pursuant to California Business & Professions Code § 17203, UE LLC is

4  entitled to preliminary and permanent injunctive relief ordering Harvey to cease this

5  unfair competition, as well as disgorgement of all of Harvey's profits associated with

6  this unfair competition.

7  **PRAYER FOR RELIEF**

8  WHEREFORE, UE LLC prays for:

9       1.   Harvey, JH Audio, his affiliates, employees, attorneys, representatives,

10  successors and assigns, and all those in privity or in active concert or participation with

11  any of them, to be preliminarily and permanently enjoined and restrained from:

12          •   Entering directly or indirectly, into the employment of, or rendering,

13  directly or indirectly, any services (whether as a director, officer,

14  employee, agent, representative, independent contractor, consultant or

15  advisor or in any other similar relationship or capacity) to, any person (the

16  "Competitor") which competes with or carries on the business or a similar

17  business to any business carried on by UE Inc., UE LLC or any of its

18  subsidiaries as of the closing of the SPA (collectively, the "Restricted

19  Business") in the counties and countries (and all cities located therein)

20  where UE Inc., UE LLC or any of its subsidiaries conducted, conducts or is

21  contemplating conducting the Restricted Business as of the closing of the

22  SPA (collectively, the "Territories");

23          •   Engaging, directly or indirectly, in any such Restricted Business in

24  any of the Territories;

25          •   Becoming interested, directly or indirectly, in any such Competitor

26  or Restricted Business as an individual, proprietor, franchisee, partner, joint

27  venturer, owner, stockholder, principal, member, investor, trustee, or any

28  other similar relationship or capacity (other than passive direct or indirect

1    ownership of less than 5% in the aggregate in any Competitor whose stock

2    is publicly traded);

3    •    Directly or indirectly, by sole action or in concert with others,

4    soliciting, inducing, or influencing, or seeking to solicit, induce or

5    influence, any person who is engaged by UE Inc., or UE LLC or its

6    subsidiaries as an employee, agent, independent contractor or otherwise, to

7    leave the employ of or engagement by UE Inc., UE LLC or its subsidiaries;

8    •    Directly or indirectly, by sole action or in concert with others,

9    soliciting, inducing or influencing, or seeking to solicit, induce or

10    influence, any customer or client of UE Inc., or UE LLC or any of its

11    subsidiaries, or any potential customer or client of UE LLC or any of its

12    subsidiaries, during the three year period immediately preceding the

13    closing of the SPA for purposes of facilitating the conduct by Harvey of a

14    Restricted Business;

15    •    Divulging, furnishing, or making accessible to any person UE LLC's

16    confidential information or trade secrets or any trade secret or confidential

17    information of third parties used in UE LLC's business;

18    •    Engaging in false advertising in violation of Section 43(a) of the

19    Lanham Act, 15 U.S.C. § 1125(a), by making false statements about

20    Harvey's purported products and services or UE LLC's products and

21    services in his commercial advertisements;

22    •    Engaging in false advertising in violation of California Business &

23    Professions Code § 17500 by making false statements, including using UE

24    LLC's name, reputation, goodwill, and clients to market his own products

25    and services, in connection with the sale of his products or services;

26    •    Intentionally interfering with the relationships between UE LLC and

27    its known customers and/or soliciting UE LLC's known customers;

28

1    •    Engaging in "unfair competition" in violation of California Business

2    & Professions Code §§ 17200 and 17203 by using unlawful and/or

3    deceptive business practices, including false advertising and interference

4    with UE LLC's business relationships;

5    •    Using any trade practices whatsoever, including those complained of

6    herein, which tend to unfairly compete with or injure UE LLC's business

7    and goodwill, or which unjustly enrich Harvey at UE LLC's expense.

8    2.    The Court to enter judgment that Harvey has taken unlawful actions that

9    constitute false and/or deceptive advertising, unfair competition, unjust enrichment, and

10   injurious falsehood, and that such unlawful actions have provided Harvey with an unfair

11   competitive advantage over UE LLC;

12   3.    The Court to require Harvey to pay to UE LLC compensatory damages for

13   the injury sustained by UE LLC in consequence of the acts herein complained of, and

14   that, with respect to all such acts committed in violation of the Lanham Act, treble

15   damages be added to such damages, as set forth in 15 U.S.C. § 1117(b);

16   4.    The Court to require Harvey to account for and pay over to UE LLC all

17   gains, profit and advantages derived by it from the activities complained of herein.

18   5.    The Court to require Harvey to deliver up for destruction all documents,

19   signs, advertisements, brochures, promotional materials and other written and graphic

20   materials which bear any statement prohibited herein.

21   6.    The Court to find this an exceptional case as set forth in 15 U.S.C.

22   § 1117(b) and require Harvey to pay to UE LLC all of its litigation expenses, including

23   reasonable attorney fees and the cost of this action.

24   7.    The Court to require Harvey to pay prejudgment interest to UE LLC, as set

25   forth in 15 U.S.C. § 1117(b).

26   8.    An award of exemplary and punitive damages to the extent allowed by law

27   and in an amount according to proof;

28   9.    For attorneys' fees and costs of suit herein pursuant to statute or as

otherwise may be allowed by law; and,

10.   The Court to grant UE LLC such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMAND**

Pursuant to Fed. R. Civ. P. 38, UE LLC hereby demands a trial by jury on all issues triable by right to a jury.

Dated:  August 10, 2009                    HOWREY LLP


By:  /s/ David M. Lisi
                                              David M. Lisi

                                           Attorneys for Defendant and Cross-
                                           Complainant Ultimate Ears, LLC

# PROOF OF SERVICE

STATE OF CALIFORNIA        )
                           )  ss.:
COUNTY OF ORANGE           )

I am employed in the County of Orange, State of California.  I am over the age of 18 and not a party to the within action.  My business address is 4 Park Plaza, Suite 1700, Irvine, CA  92614.

On August 10, 2009, I served on the interested parties in said action the within:

**ULTIMATE EARS, LLC'S COUNTER-COMPLAINT FOR 1.) BREACH OF CONTRACT; 2.) BREACH OF THE COVENANT OF GOOD FAITH AND FAIR DEALING; 3.) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE; 4.) FALSE ADVERTISING (LANHAM ACT); 5.) FALSE ADVERTISING (CAL. BUS. & PROF. CODE § 17500); AND 6.) UNFAIR COMPETITION (CAL. BUS. & PROF. CODE § 17200)**

by placing a true copy thereof in a sealed envelope(s) addressed as stated on the attached mailing list and causing such envelope(s) to be deposited in the U.S. Mail at Irvine, California.

[X]   (CM/ECF SERVICE)  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

I declare under penalty of perjury that I am employed in the office of a member of the bar of this Court at whose direction the service was made and that the foregoing is true and correct.

Executed on August 10, 2009, at Irvine, California.

_____          _____
          Shawn Beem
     (Type or print name)                          (Signature)

1

## <u>SERVICE LIST</u>

*Jerry Harvey, et al. v. Ultimate Ears, LLC, et al./*Case No.  8:09-cv-00668-DOC-MLG

## ATTORNEYS FOR PLAINTIFF, JERRY HARVEY, JR.

| | |
|---|---|
| Craig J. Mariam<br>**Gordon and Rees**<br>633 West 5th Street, Suite 4900<br>Los Angeles, CA  90071<br>Tel.:  213/576-5000<br>Fax:  213/680-4470<br>Email:  cmariam@gordonrees.com | J. Scott Burris<br>**Gibson Lowry Burris LLP**<br>7201 West Lake Mead Blvd., Suite 503<br>Las Vegas, NV  89128<br>Tel.:  702/541-7892<br>Fax:  702/541-7899<br>Email:  sburris@gibsonlawry.com |
| Jodi Donetta Lowry<br>**Clary Gibson Lowry LLP**<br>7201 West Lake Mead Blvd., Suite 503<br>Las Vegas, NV  89128<br>Tel.:  702/309-0784<br>Fax:  702/382-7277<br>Email:  jdlowry@gibsonlowry.com | Steven A. Gibson<br>**Gibson Lowry Burris LLP**<br>7201 West Lake Mead Blvd., Suite 503<br>Las Vegas, NV  89128<br>Tel.:  702/541-8200<br>Fax:  702/541-7899<br>Email:  sgibson@gibsonlowry.com |

## ATTORNEYS FOR DEFENDANTS

### UE INVESTMENT LLC, a California limited-liability company; INNOVATE PARTNERS, INC., a California corporation; UE TWO LLC, a California limited-liability company; and ROBERT G. ALLISON, an individual

| | |
|---|---|
| Michael D. Adams<br>**Rutan & Tucker LLP**<br>611 Anton Boulevard, 14th Floor<br>Costa Mesa, CA 92626-1931<br>Tel.:  714/641-5100<br>Fax:  714/546-9035<br>Email:  madams@rutan.com | Steven J. Goon<br>**Rutan & Tucker LLP**<br>611 Anton Blvd., 14th Floor<br>Costa Mesa, CA  92626-1931<br>Tel.:  714/641-5100<br>Fax:  714/546-9035<br>Email:  sgoon@rutan.com |